USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 30, 2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                   :

A.P. and S.P., on behalf of A.P., a minor child,      :
                                                   :

                                  Plaintiffs,      :
                                                   :

                                                   :               14-cv-477 (KBF)
                                                   :

                       -v-                                :
                                                   :               OPINION & ORDER

NEW YORK CITY DEPARTMENT OF          :
EDUCATION,                                         :

                                     Defendant.      :
                                                   :
------------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

       On January 24, 2014, plaintiffs-appellants A.P. and S.P. ("plaintiffs" or

"Parents") filed this action on behalf of their minor child A.P. ("A.P." or "Student")

pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§

1400 et seq.  (ECF No. 1 ("Compl.").)  Plaintiffs seek review of the October 25, 2013

administrative decision of State Review Officer Justyn P. Bates ("SRO") that denied

tuition reimbursement for the Student's attendance at a private school during the

2012-2013 school year.  The SRO's decision reversed a July 12, 2013 decision of

Impartial Hearing Officer Nancy Lederman ("IHO").

       On October 7, 2014, plaintiffs moved for summary judgment, seeking an

order reversing the SRO's decision and reinstating the IHO's award of tuition

reimbursement.  (ECF No. 9.)  On December 8, 2014, defendant-appellee the New

York City Department of Education ("defendant" or "DOE") cross-moved for summary judgment, seeking an order affirming the SRO's decision and dismissing plaintiffs' complaint.  (ECF No. 14.)  These motions became fully briefed on February 13, 2015.  For the reasons set forth below, plaintiffs' motion for summary judgment is DENIED and the DOE's cross-motion for summary judgment is GRANTED.

I.      BACKGROUND

        A.      The Student

        A.P., born on June 20, 1997, has been classified by the DOE as having a speech or language impairment.  (Ex. 3-1.[1])  He has been diagnosed with Attention Deficit Hyperactive Disorder ("ADHD"), Dyspraxia, and Sensory Integration Disorder.  (Id.; Ex. 9-1.)  A.P. takes medication for his ADHD as well as for anxiety.  (Ex. 3-2.)  A.P. did not speak his first words until he was three or four years old (Ex. 10-1), and tested at the fifth percentile or lower in each of four different subtests of expressive language (Ex. 10-2).  A.P. engages in "silly" behaviors, such as inappropriate laughing in the classroom.  (See Ex. 3-1, Tr. 87-88.)

        A.P. has attended the Aaron Academy ("Aaron"), a private school, since the 2004-2005 school year.  (See Tr. 199; see also Ex. 8-1.)  On February 27, 2012, plaintiffs unilaterally re-enrolled A.P. at Aaron for the 2012-2013 school year.  (Ex. E.)

---

[1] Citations in the form of "Ex. ___" are to exhibits from the underlying administrative hearing before the IHO.  "Ex. X-p" refers to page p of exhibit X.  Citations in the form of "Tr. ___" are to pages from the transcript of the hearing before the IHO.

B.    The CSE Meeting, the IEP, and the Recommended Placement

On April 23, 2012, the DOE convened a Committee on Special Education ("CSE") meeting to formulate an individualized education program ("IEP") for A.P. for the 2012-2013 school year.  (See Ex. 3-10; Tr. 28.)  Participants at the April 2012 CSE meeting included (1) Plaintiff A.P. ("Mr. P"), the Student's father; (2) Rose Fochetta, a DOE school psychologist and district representative; (3) Feng Ye, a DOE special education teacher; (4) Matthieu Moss, A.P.'s former teacher at Aaron; and (5) Carmen Garcia, a parent member.  (See Ex. 3-12.)  Ms. Fochetta is a New York State certified school psychologist with a bachelor's degree in elementary education, a master's degree in educational psychology, and a professional diploma in school psychology.  (Tr. 26.)  Ms. Ye is certified in special education for kindergarten through twelfth grades.  (Tr. 38.)

Ms. Fochetta testified that prior to the CSE meeting she gathered and reviewed A.P.'s evaluations—including a social history update (Ex. 8), an educational report (Ex. 9), a speech/language ("S/L") evaluation (Ex. 10), and the most recent school reports from Aaron (Exs. 6 and 7).  (Tr. 31.)  Based on these reports, Ms. Fochetta and Ms. Ye created a draft IEP for the participants' review and use at the meeting.  (Tr. 39-41, 69; Ex. 4.)

Ms. Fochetta testified that she provided Mr. P with a copy of the draft IEP at the CSE meeting, and read the relevant portions of the draft IEP to Mr. Moss, who participated by phone.  (Tr. 39-40.)  Ms. Fochetta also placed a copy of the documents that she reviewed in preparation for the CSE meeting on the table for reference.  (Tr. 39, 70.)  The group then went through the draft IEP section by

section, during which Ms. Fochetta and Ms. Feng took notes both on the draft IEP and on the meeting minutes form.  (Id. at 40, 43, 49-51; see also Ex. 4 (draft IEP with handwritten notes); Ex. 5 (meeting minutes form).)  Ms. Fochetta testified that, in her opinion, everyone was given an opportunity to fully express their concerns and thoughts at the CSE meeting.  (Tr. 65.)  Ms. Fochetta further testified that plaintiff Mr. P was "very communicative" (Tr. 46) and "fully engaged" (Tr. 79) during the meeting—and that both Mr. P and Mr. Moss relayed their perspectives and concerns about the Student and various sections of the IEP (see Tr. 43, 51, 54, 57, 60-61, 76-77, 79-80).  Mr. P's concerns are expressly noted on the meeting minutes form and in the IEP.  (Exs. 3, 5-1.)  Ms. Fochetta testified that team chose an ICT placement after discussing the Student's support needs and goals at the CSE meeting—and considering the alternative option of placing the Student into "a self-contained class or a small classroom setting, throughout the day."  (Tr. 59-61.)

Plaintiff Mr. P testified that the CSE meeting was "pretty short" and that "it was pretty clear" "that it was just going through the motions of completing a document to reach the goal of this integrated class ICT or CTT program."  (Tr. 273.)  He testified that nobody limited his ability to participate in the meeting—but his contributions were given little, if any, weight.  (See Tr. 301-03.)  According to Mr. P, Ms. Fochetta and Ms. Ye told him that they had "no choice" but to recommend the ICT.  (Tr. 275.)  However, Mr. P also testified that there were "heated" discussions regarding the recommendation for ICT services (id.)—and acknowledged that both he and Mr. Moss participated in those discussions, expressing their disagreement

with the recommendation (Tr. 273-75).  In addition, Mr. P testified that the CSE engaged in a "big discussion" over the Student's inability to perform in a general education setting.  (Tr. 287-88.)  Mr. P denied receiving a copy of the draft IEP—and testified that he did not ask for one.  (See Tr. 271-72, 307.)

As a result of the April 2012 CSE meeting, the CSE team developed an IEP, which recommended that A.P. be placed in an integrated co-teaching ("ICT") class for core academic classes—mathematics, English/language arts, social studies, and science—in a general education school.[2]  (Ex. 3-6–3-7.)  In addition, the CSE recommended that A.P. receive three 40-minute sessions of speech-language ("S/L") therapy per week (one on an individual basis and two in the classroom)[3], two 40-minute sessions of occupational therapy (one on an individual basis and one in the classroom), and two 40-minute sessions of counseling (one on an individual basis and one in the classroom).  (See Exs. 3-7, 3-10, 4-4, 5-2.)  The IEP indicates that the CSE team considered other placement options—special classes in a community school with student-to-teacher ratios of 12:1 and 12:1:1—but rejected those options as overly restrictive.  (Ex. 3-11.)  The IEP notes that A.P. "functions in the average range in all academic areas and as such, he should have full access to non disabled peers throughout the school day."  (Id.)

---

[2] An ICT program consists of a class taught by both a special education teacher and general education teacher that includes "specially designed instruction" for "a group of students with disabilities and nondisabled students."  8 N.Y.C.R.R. § 200.6(g).  For each ICT class, "the number of students with disabilities in [the] class[] shall not exceed 12 students."  Id. § 200.6(g)(1).

[3] The final version of IEP lists only two S/L therapy sessions per week, but this appears to be a typo. The parties agree that the correct number is three.

The final version of the IEP contains a substantial number of additions and changes as compared to the draft IEP.  (Compare Ex. 3 with Ex. 4.)  The final version contains information provided by plaintiff Mr. P and Mr. Moss at the CSE meeting.  For example, the IEP notes that Mr. P was concerned with A.P.'s tendency to rush and be silly in school (Ex. 3-1), A.P.'s different interests from his peers (Ex. 3-2), and A.P.'s need for consistent support with occupational therapy (Ex. 3-2).  The IEP also reflects that Mr. P was concerned that an ICT class would not provide A.P. with sufficient support.  (Ex. 3-11; see also Tr. 45.)  In addition, the "Social Development," "Physical Development," "Management," "Testing Accommodations," and "Coordinated Set of Transition Activities" sections of the IEP were supplemented and revised.  (See Exs. 3, 4.)  The "Annual Goals" section— which is blank in the draft IEP—was also developed at the meeting.  (See Exs. 3-3– 3-6, 5-2; Tr. 47-48 (Ms. Fochetta: the annual goals were "developed at the meeting, cooperatively, with everyone participating").)  The final IEP also contains significant changes regarding the ultimate recommendation and placement.  In particular, the draft IEP did not contain a recommendation for an ICT program— and Ms. Fochetta wrote "continue [ICT]" on the draft IEP during the CSE meeting, suggesting that the decision to place A.P. into an ICT class was made at the CSE meeting.  (Ex. 4-4.)  The draft IEP also did not list the ultimate placement recommendation.  (Ex. 4-7.)  The final IEP also differed from the draft IEP in that it recommended an additional session of S/L therapy and made certain related services "push-in" services (therapies that occur in the classroom).  (Id.)  Ms.

Fochetta testified that these changes were based on a discussion with plaintiff Mr. P and Mr. Moss at the CSE meeting.  (Tr. 57.)

On August 3, 2012, the CSE issued a Final Notice of Recommendation ("FNR").  (See Ex. 12.)  The FNR recommended a placement for A.P. at J.H.S. 167, the Robert F. Wagner School, 220 East 76th Street, New York, New York ("Wagner").  (Ex. 12-1.)  Because A.P. was never enrolled at Wagner[4], he was never assigned to a specific classroom at the school.  (See Tr. 168.)

C.    Plaintiffs' Rejection of the Placement and Their Complaint

On August 22, 2012, plaintiff S.P. ("Ms. P"), the Student's mother, wrote a letter to the CSE, explaining that she would visit Wagner once it opened in September to gauge its appropriateness.  (Ex. H.)  Plaintiff Ms. P requested a "class profile detailing the functional level" of A.P.'s potential classmates.  (Id.)

Ms. P visited Wagner on September 12, 2012.  (Tr. 315.)  Following Ms. P's visit to Wagner, she notified the DOE by letter dated September 24, 2012 that she was rejecting the recommended ICT program at Wagner, and instead sought full tuition for Aaron from the DOE.  (See Ex. J.)  Plaintiff's stated reasons for rejecting the recommended program were the size of the school, the size of the ICT class, the lack of small-group instruction, the "high level of noise" at lunch, the school's "bullying issues," as well as the fact that "[s]ome of the children were non English speaking" and that A.P. would be "pulled out from instruction to receive his related

---

[4] Plaintiffs had enrolled A.P. at Aaron for the 2012-2013 school year over five months earlier.  (See Ex. E.)

services." (Id.)  Ms. P noted that she had not received the class profile that she had requested.  (Ex. J-2.)

On January 25, 2013, plaintiffs filed a Due Process Complaint ("DPC") alleging that the IEP contained "multiple procedural and substantive errors."  (See Ex. 1.)

D.     The Decisions of the IHO and SRO

In response to plaintiffs' request for an impartial hearing, an IHO held a two-day hearing on May 14, 2013 and June 11, 2013.  Following the hearing, the IHO found that the CSE predetermined the outcome of the CSE meeting, that the Parents were deprived of a meaningful opportunity to participate in the meeting, that the CSE was improperly composed, and that the ICT class program was inappropriate.  (See Findings of Fact and Order, Case No. 143459, dated July 12, 2013 ("IHO Decision"), at 15-17.)  The IHO determined that the DOE had failed to offer A.P. a free appropriate public education ("FAPE") for the 2012-2013 school year, and awarded plaintiffs reimbursement for the cost of the Aaron tuition.  (See id. at 17-18.)

The DOE appealed the IHO's decision to the SRO.  In an eighteen-page, single-spaced decision, the SRO found that the IEP was reasonably calculated to meet A.P.'s needs and to provide him with educational benefits.  (Application of the New York City Department of Education, Appeal No. 13-153, dated Oct. 25, 2013 ("SRO Decision"), at 8-18.)  The SRO did not reach the question of whether

plaintiffs' unilateral placement of A.P. at Aaron was appropriate or whether equitable considerations precluded an award of tuition reimbursement.[5]  (Id. at 18.)

On January 24, 2014, plaintiffs filed the present action seeking reversal of the SRO's decision.

## II.   LEGAL FRAMEWORK

A motion for summary judgment in an IDEA case is "in substance an appeal from an administrative determination, not a summary judgment [motion]."  M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 226 (2d Cir. 2012) (quoting Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005)) (internal quotation mark omitted).  The motion triggers review of "a state's compliance with the procedures set forth in [the] IDEA" and whether the challenged individualized education program ("IEP") is "reasonably calculated to enable the child to receive educational benefits."  Id. at 225-26 (quoting Lillbask, 397 F.3d at 83 n.3).  "[B]asing its decision on the preponderance of the evidence, [the Court] shall grant such relief as [it] determines is appropriate."  20 U.S.C. § 1415(i)(2)(C)(iii).  The review is substantive and considers more than whether a material fact is disputed.

### A.   General Framework

The IDEA requires states receiving federal funds to provide all children with disabilities in the state a FAPE "that emphasizes special education and related

---

[5] Given that these questions were not addressed by the SRO, the Court does not reach them here. See M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ., 226 F.3d 60, 66 (2d Cir. 2000) ("If the challenged IEP was adequate, the state has satisfied its obligations under the IDEA and the necessary inquiry is at an end." (citation omitted)).

services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A); see also id.

§ 1412(a)(1)(A).  A FAPE must be "reasonably calculated to enable the child to receive educational benefits."  Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007) (quoting Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998)) (internal quotation marks omitted).

The state's DOE must develop an IEP for each disabled child that "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."  Honig v. Doe, 484 U.S. 305, 311 (1988) (citation omitted); see also 20 U.S.C. § 1414(d)(1)(A).  An IEP is adequate under the IDEA if it is "likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement."  T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 254 (2d Cir. 2009) (citation and quotation mark omitted).  An IEP is not required to "furnish[] . . . every special service necessary to maximize each handicapped child's potential."  Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 379 (2d Cir. 2003) (citation and internal quotation marks omitted).  In New York State, the formulation of IEPs is delegated to a local CSE, consisting of school board representatives, educators, clinicians, and parents.  N.Y. Educ. Law § 4402.

Parents may challenge the offered IEP by filing a due process complaint.  See 20 U.S.C. § 1415(b)(6)(A).  The parents may then proceed to a due process hearing before an IHO.  See id. § 1415(f)(1)(A).  The IHO's decision may be appealed by either party to the SRO, who independently reviews the findings and decision rendered by the IHO.  Id. § 1415(g).  While the SRO's decision is considered final, a party aggrieved by that decision may bring an action for relief in state or federal court.  Id. § 1415(i)(1)(B), (2)(A).

The IDEA "authorizes reimbursement for the cost of private special-education services when a school district fails to provide a FAPE and the private-school placement is appropriate."  Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 247 (2009).  The Court must conduct a two-part analysis to determine whether a school district has offered to provide a student with a FAPE:  First, the Court asks whether "the State complied with the procedures set forth in the [IDEA]."  M.H., 685 F.3d at 245 (citation and internal quotation marks omitted).  Second, the Court asks whether the IEP developed through the IDEA's procedures is "reasonably calculated to enable the child to receive educational benefits."  Id. (citation and internal quotation mark omitted).  If the State has failed to comply with the procedural or substantive requirements of the IDEA in a manner that constitutes a denial of a FAPE, then the Court must inquire whether the private schooling obtained by the parents "is appropriate to the child's needs" and must weigh "equitable considerations relating to the reasonableness of the action taken by the parents."  Id. (citations and internal quotation marks omitted).  If the State has denied the student a FAPE, if the

private school placement is appropriate, and if the equities favor the parents, then the school district must reimburse the parents for the "expenses that it should have paid all along." Id. at 246 (citation and internal quotation marks omitted).

     B.    Procedural Considerations

"[N]ot every procedural error will render an IEP legally inadequate." Id. (citation omitted). Rather, relief is warranted only if the alleged procedural inadequacies "(I) impeded the child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of [a FAPE] to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

To be procedurally sound, an IEP must also contain: "(1) the student's present levels of academic achievement and functional performance; (2) measurable annual goals for the child; (3) the method used to measure the student's progress toward those goals; (4) the special education and related services that the IEP recommends; (5) an explanation of the extent to which the student will be educated with 'nondisabled' peers; (6) the reasons for any alternate assessments; and (7) the start date for recommended services, their duration, and their frequency." M.H., 685 F.3d at 245 (citations omitted).

When developing an IEP, a CSE is required to "review existing evaluation data on the child, including–(i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or State assessments, and classroom-based observations; and (iii) observations by teachers and related service providers." 20 U.S.C. § 1414(c)(1)(A). After reviewing that information, the CSE then

determines whether additional data are needed to complete the IEP.  Id. §

1414(c)(1)(B).  If needed, the CSE should administer an assessment or evaluation.

Id. § 1414(c)(2).  The CSE is authorized to decide that no further evaluations are

needed.  Id. § 1414(c)(4).  The results of the initial or most recent evaluation of the

student and any independent evaluations obtained at public expense must be

considered in connection with the development of the IEP.  34 C.F.R. § 300.324;

N.Y. Comp. Codes R. & Regs. tit. 8, §§ 200.4(f)(1), 200.5(g)(1)(vi).

    C.   Substantive Considerations

When reviewing substantive compliance, the IDEA provides only for a "basic

floor of opportunity . . . consist[ing] of access to specialized instruction and related

services which are individually designed to provide educational benefit to the

handicapped child."  Bd. of Educ. v. Rowley, 458 U.S. 176, 201 (1982) (internal

quotation marks omitted).  An IEP is appropriate if it is "likely to produce progress,

not regression" and provides an opportunity for more than mere "trivial

advancement."  Walczak, 142 F.3d at 130 (internal quotation marks omitted).  The

IDEA only guarantees an "appropriate" education, "not one that provides

everything that might be thought desirable by loving parents."  Id. at 132 (citations

and internal quotation marks omitted).

The IDEA requires, inter alia, "(I) a statement of the child's present levels of

academic achievement and functional performance . . . (II) a statement of

measurable annual goals, including academic and functional goals . . . [and] (III) a

description of how the child's progress toward meeting the annual goals described in

subclause (II) will be measured."  20 U.S.C. § 1414(d)(1)(A)(i).

III.    STANDARD OF REVIEW

District courts independently review the administrative record and make

determinations based on a preponderance of the evidence.  See M.H., 685 F.3d at

240.  Because the judiciary lacks expertise in educational policy, courts will not

"substitute their own notions of sound educational policy for those of the school

authorities which they review."  Rowley, 458 U.S. at 206; see also M.S. v. Yonkers

Bd. of Educ., 231 F.3d 96, 102 (2d Cir. 2000) (Courts are expected to give "due

weight" to administrative proceedings because they generally lack "the specialized

knowledge and experience necessary to resolve persistent and difficult questions of

educational policy." (citations and internal quotation marks omitted)); R.E. v. New

York City Dep't of Educ., 694 F.3d 167, 189 (2d Cir. 2012) ("We must give 'due

weight' to the state proceedings, mindful that we lack 'the specialized knowledge

and experience necessary to resolve . . . questions of educational policy.'" (citation

and internal quotation marks omitted)).  Thus, while IDEA administrative

determinations are subject to independent judicial review, both the Supreme Court

and the Second Circuit have consistently construed the IDEA to "strictly limit[]

judicial review of state administrative decisions."  Grim, 346 F.3d at 380 (citations

omitted); see also C.F. v. N.Y. City Dep't of Educ., 746 F.3d 68, 77 (2d Cir. 2014)

("The standard of review 'requires a more critical appraisal of the agency

determination than clear-error review but nevertheless falls well short of complete

de novo review.'" (quoting M.H., 685 F.3d at 244)).

When an IHO and SRO reach conflicting conclusions, as here, the Court

generally defers to the SRO.  R.E., 694 F.3d at 189.  The Court "must defer to the

SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead."  Id.; see also M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ., 725 F.3d 131, 139 (2d Cir. 2013) ("Where an SRO has clearly demonstrated a better command of the record and supported her conclusions through better legal and factual analysis than an IHO, we will have little difficulty deferring to the SRO's opinion." (citation omitted)).

Deference to the SRO's decision "is particularly appropriate when . . . the state hearing officer's review has been 'thorough and careful.'" R.E., 694 F.3d at 184 (quoting Walczak, 142 F.3d at 129)); see also M.H., 685 F.3d at 244 ("Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not." (citation omitted)).  An SRO decision deserves deference "even where the reviewing authority disagrees with the hearing officer." Id. at 240 (citation and internal quotation mark omitted).  More deference is warranted when reviewing "the substantive adequacy of an IEP," the adequacy of an educational methodology, and records containing the same evidence that was before the SRO.  Id. at 244. Less deference is warranted in appeals involving an IEP's procedural validity, objective indications of student progress, and records with new evidence.  Id.  Deference to a well-reasoned SRO determination merits particular importance where, as here, the Court's decision rests solely on the administrative record.  See id. at 241.  Where an SRO has concluded that an IEP

was proper, the burden of demonstrating that the SRO erred falls on the plaintiff.

<u>Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.</u>, 760 F.3d 211, 219 (2d Cir. 2014).

IV.   DISCUSSION

Plaintiffs seek reversal of the SRO's decision on three principal grounds. First, plaintiffs argue that A.P.'s IEP was "predetermined" in advance of the April 2012 CSE meeting.  Second, plaintiffs argue that the CSE team was improperly composed because no general education teacher was present.  Third, plaintiffs argue that the SRO's substantive determination does not deserve deference because it fails to account for A.P.'s social and emotional deficits.  These arguments are without merit.  As further explained below, the SRO properly determined that the DOE offered A.P. a FAPE for the 2012-2013 school year.

A.   <u>Predetermination</u>

Plaintiffs argue that Ms. Fochetta and/or Ms. Fe predetermined the IEP by developing a draft IEP prior to the April 2012 CSE meeting, not providing a copy of that draft IEP to plaintiffs, depriving plaintiffs of a meaningful opportunity to participate in the meeting, and refusing to consider anything other than an ICT class recommendation.  These arguments are meritless.  There is nothing unusual about bringing a draft to an important meeting; if anything, a draft suggests preparation, not predetermination.  The record shows that Mr. P participated in the

CSE meeting and that the draft was changed in response to, <u>inter alia</u>, input from the Student's father and former teacher.[6]

Predetermination of a student's IEP amounts to a procedural violation of the IDEA "if it deprives the student's parents of meaningful participation in the IEP process." <u>B.K. v. New York City Dep't of Educ.</u>, 12 F. Supp. 3d 343, 358 (E.D.N.Y. 2014) (collecting cases).  For an IEP to be predetermined, the district must "not have an open mind" to consider alternative programs or services during the meeting.  <u>T.P.</u>, 554 F.3d at 253.  Mere parental disagreement with a school district's IEP and placement recommendation does not amount to a denial of meaningful participation.  <u>See</u> <u>B.K.</u>, 12 F. Supp. 3d at 359 ("The mere fact that the CSE's ultimate recommendation deviated from the[] express request [of the Parents] does not render the Parents 'passive observers' or evidence any predetermination on the part of the CSE." (citations omitted)); <u>P.K. v. Bedford Cent. Sch. Dist.</u>, 569 F. Supp. 2d 371, 383 (S.D.N.Y. 2008) ("The fact that the District staff ultimately disagreed with the opinions of plaintiffs and their outside professionals does not mean that plaintiffs were denied the opportunity to participate in the development of the IEP's, or that the outcomes of the CSE meetings were 'pre-determined.'  A professional disagreement is not an IDEA violation."); <u>Sch. For Language & Commc'n Dev. v. New York State Dep't of Educ.</u>, No. 02 CV 0269 JS JO, 2006 WL 2792754, at *7 (E.D.N.Y. Sept. 26, 2006) ("Meaningful participation does not require deferral to parent choice." (citations omitted)).

---

[6] In addition to finding that the IEP was not predetermined, the SRO determined that the predetermination issue was not properly before the IHO because it was not alleged in plaintiffs' DPC.  The Court need not reach this question here.

"[P]redetermination is not synonymous with preparation." Nack ex rel. Nack v. Orange City Sch. Dist., 454 F.3d 604, 610 (6th Cir. 2006). "IDEA regulations allow school districts to engage in 'preparatory activities . . . to develop a proposal or response to a parent proposal that will be discussed at a later meeting' without affording the parents an opportunity to participate." T.P., 554 F.3d at 253 (citations omitted). In particular, school districts are permitted to come prepared to the CSE meeting with a draft IEP—as long as it has not been finalized and the parents are not deprived of "the opportunity to meaningfully participate in the IEP development process." M.M. ex rel. A.M. v. New York City Dep't of Educ. Region 9 (Dist. 2), 583 F. Supp. 2d 498, 506 (S.D.N.Y. 2008) (citations omitted); see also Dirocco ex rel. M.D. v. Bd. of Educ. of Beacon City Sch. Dist., No. 11 CIV. 3897 ER, 2013 WL 25959, at *18 (S.D.N.Y. Jan. 2, 2013); Nack, 454 F.3d at 611 ("[S]chool evaluators may prepare reports and come with pre-formed opinions regarding the best course of action for the child as long as they are willing to listen to the parents and parents have the opportunity to make objections and suggestions." (citation and internal quotation marks omitted)); W.S. ex rel. C.S. v. Rye City Sch. Dist., 454 F. Supp. 2d 134, 147-48 (S.D.N.Y. 2006) (Equating draft IEPs containing proposed placements with predetermination "will inevitably lead to gamesmanship in the preparation of IEPs by CSEs, with the district withholding points of view that ought to be out on the table and subject to discussion and parental challenge (which may or may not be successful) prior to the document's finalization.").

Here, it is clear from the record that the DOE representatives came to the April 2012 CSE meeting with an open mind—and that the draft IEP was substantially changed and amended during the CSE meeting.  As Ms. Fochetta testified, the group went through the draft IEP section by section—and Ms. Fochetta and Ms. Feng took notes both on the draft IEP and on the meeting minutes form.  (Id. at 40, 43, 49-51; see also Ex. 4 (draft IEP with handwritten notes); Ex. 5 (meeting minutes).)  The final version of the IEP is substantially different from the draft IEP.  (Compare Ex. 3 with Ex. 4.)  The "Social Development," "Physical Development," "Management," "Testing Accommodations," and "Coordinated Set of Transition Activities" sections of the IEP were supplemented and revised.  (See Exs. 3, 4.)  The "Annual Goals" section was also developed at the CSE meeting.  (See Exs. 3-3–3-6, 5-2; Tr. 47-48.)  The final IEP also contains the ultimate recommendation and placement—which were left blank in the draft IEP.  Ms. Fochetta's handwritten notation "continue [ICT]" on the draft IEP suggests that the decision to place A.P. into an ICT class was made at the CSE meeting.  (Ex. 4-4.)  The final IEP also recommended an additional session of S/L therapy and made certain related services "push-in" services (therapies that occur in the classroom).  (Id.)

The record also indicates that plaintiff Mr. P meaningfully participated in the CSE meeting.  Ms. Fochetta testified that plaintiff Mr. P was "very communicative" (Tr. 46) and "fully engaged" (Tr. 79) during the meeting—and that both Mr. P and Mr. Moss relayed their perspectives and concerns about the Student and various

sections of the IEP (see Tr. 43, 51, 54, 57, 60-61, 76-77, 79-80).  Mr. P acknowledged that there were "heated discussions" concerning the recommendation for ICT services—and that both he and Mr. Moss participated in those discussions and expressed their disagreement with the ICT recommendation.  (Tr. 273-75.)  Mr. P's participation is also reflected in the minutes form (Ex. 5-1), as well as in the IEP itself:  The IEP notes that Mr. P was concerned with A.P.'s tendency to rush and be silly in school (Ex. 3-1), A.P.'s different interests from his peers (Ex. 3-2), and A.P.'s need for consistent support with occupational therapy (Ex. 3-2).  The IEP also reflects that Mr. P was concerned that an ICT class would not provide A.P. with sufficient support.  (Ex. 3-11; see also Tr. 45.)

Plaintiffs' argument that the IEP was predetermined because the CSE refused to consider anything other than an ICT class recommendation (Pls.' Br. at 8) is without merit.  As discussed above, the IEP specifically states that other programs, both 12:1:1 and 12:1 special education classes, were considered by the CSE team but were ultimately rejected because they were overly restrictive for A.P. (Ex. 3-11.)  Ms. Fochetta also testified that 12:1:1 and 12:1 classes were considered and discussed by the group, but were eventually rejected because A.P. "should have full access to the general education curriculum and typically developing peers throughout the school day."  (Tr. 59-60.)[7]

---

[7] Plaintiffs assert that Ms. Fochetta did not bring A.P.'s entire educational file to the CSE meeting (see Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment ("Pls.' Br.") at 8-9, ECF No. 10.)  However, Ms. Fochetta testified that she brought A.P.'s up-to-date evaluations—including the social history update (Ex. 8), educational report (Ex. 9), S/L evaluation (Ex. 10), and Aaron reports (Exs. 6 and 7)—to the meeting and put a copy of each documents on the table for reference during the meeting.  (Tr. 39, 70.)  That is sufficient; plaintiffs cite to no authority requiring the Student's entire educational file to by physically brought to the CSE meeting.

B.   <u>CSE Composition</u>

Plaintiffs argue that the CSE team was improperly composed because there was no general education teacher at the meeting.  (Pls.' Br. at 9-10.)  This argument fails.

The IDEA requires the CSE to include at least "1 regular education teacher" of the student "if the child is, or may be, participating in the regular education environment."  20 U.S.C. § 1414(d)(1)(B)(ii); <u>see also</u> <u>J.G. v. Kiryas Joel Union Free Sch. Dist.</u>, 777 F. Supp. 2d 606, 644 (S.D.N.Y. 2011) ("If the child's placement does not, and is not likely to, involve a regular education classroom, then the CSE need not include a regular education teacher.").  Here, the CSE team considered 12:1 and 12:1:1 self-contained classes and an ICT class, which was ultimately the program recommended for A.P.  (<u>See</u> Ex. 3-6, 3-7, 3-11.)  None of these programs are regular education programs which require the participation of a general education teacher at the CSE meeting.  <u>See</u> 20 U.S.C. § 1414(d)(1)(B)(ii); <u>S.F. v. New York City Dep't of Educ.</u>, No. 11 CIV. 870 DLC, 2011 WL 5419847, at *9 (S.D.N.Y. Nov. 9, 2011) ("Although the IEP does indicate that a [ICT] environment was discussed at the CSE meeting, such classes are co-taught by a special education teacher and are not mainstream.  A regular education teacher would therefore be neither required under the statute nor be able to add anything to a discussion about such a

_____

Plaintiffs also argue that the draft IEP and A.P.'s evaluations were not provided to plaintiff Mr. P at the meeting.  (<u>See</u> Pls.' Br. at 8.)  This is a disputed issue of fact: Ms. Fochetta testified that she gave a copy of the draft IEP to plaintiff Mr. P at the CSE meeting and read the relevant portions of the draft IEP to Mr. Moss who participated by phone.  (Tr. 38-40.)  The Court need not resolve this disputed issue for purposes of the instant appeal: even if Ms. Fochetta did not provide Mr. P with a copy of the draft IEP and evaluations, the record is clear that the draft IEP was substantially changed during the meeting, the program recommendation was added to the IEP during the meeting, and Mr. P meaningfully participated in the meeting.  No more is required.

classroom other than what a special education teacher would be able to contribute.").  Accordingly, the lack of a general education teacher at the April 2012 CSE meeting did not amount to a procedural violation.

In any event, even if the absence of a general education teacher amounted to a procedural violation, the SRO correctly determined that the absence of such teacher did not warrant relief.  See J.G., 777 F. Supp. 2d at 644 ("Even if the absence of a regular education teacher is deemed to have contravened the IDEA, the IEP itself is not rendered a 'nullity,' unless the absence 'impeded the child's right to a free appropriate public education,' 'significantly impeded' the parents' 'opportunity to participate in the decision making process,' or 'caused a deprivation of educational benefits.'" (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)).  As discussed above, plaintiff Mr. P meaningfully participated at the CSE meeting despite the absence of a general education teacher.  There is also no evidence in the record suggesting that the lack of a general education teacher at the CSE meeting somehow impeded A.P.'s right to a FAPE or resulted in a deprivation of educational benefits.  Plaintiffs have not provided any evidence of the additional value that a general education teacher would have added to the CSE meeting.[8]  See J.F. v. New York City Dep't of Educ., No. 12 CIV. 2184 KBF, 2012 WL 5984915, at *7 (S.D.N.Y. Nov. 27, 2012) (holding

---

[8] Plaintiffs assert that Ms. Fochetta was mistaken about how many students were in an ICT class— and that a general education teacher could have better explained the number of students that were in an ICT program.  (Pls.' Br. at 10.)  Ms. Fochetta testified that the average number of students in an ICT class was "in the mid 20s," with the low end being "22 to 23" and the high end "as high as 30." (Tr. 78.)  Plaintiffs argue that this is inaccurate because Courtney Dowd, Assistant Principal at the Wagner School, testified that ICT classes are capped at 33 students.  (Tr. 132.)  Needless to say, this minor discrepancy hardly suggests that Ms. Fochetta was unqualified—or that the presence of a general education teacher was necessary or advisable.

that the absence of a general education did not deny the student a FAPE where the plaintiffs did not "provide any evidence of concerns during the IEP meeting that required a general education teacher to resolve"); E.A.M. v. New York City Dep't of Educ., No. 11 CIV. 3730 LAP, 2012 WL 4571794, at *7 (S.D.N.Y. Sept. 29, 2012) (holding that the absence of a general education did not deny the student a FAPE where it was unclear what a general education teacher "would have added to the discussion").[9]

C.   Substantive Considerations

Plaintiffs argue that the SRO's substantive determination does not deserve deference because it "fails to account for A.P.'s significant social and emotional deficits." (Pls.' Br. at 10.) This challenge is without merit.[10]

The SRO's determination regarding the substance of an IEP program is particularly entitled to deference. T.Y. v. N.Y. City Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009) ("[B]ecause administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." (citation and internal quotation

---

[9] The Court notes that plaintiffs' argument that a general education teacher was needed at the CSE meeting is undercut by their argument that A.P. required a more restrictive program (a 12:1 or 12:1:1 self-contained program) than the ICT program that was ultimately chosen. The "rationale for requiring the attendance of a regular education teacher is closely tied to Congress's 'least restrictive environment' mandate. The input provided by a regular education teacher is vitally important in considering the extent to which a disabled student may be integrated into a regular education classroom." Deal v. Hamilton County Bd. of Educ., 392 F.3d 840, 860 (6th Cir. 2004). If plaintiff sought a more restrictive program, a general education teacher would have added little, if any, value.

[10] Plaintiffs also argue that the issue of whether the IEP addressed A.P.'s alleged social and emotional issues was not properly before the SRO because the DOE had not appealed the IHO's finding in that regard. This argument is also without merit: the reasons underlying the IHO's determination that the IEP was not appropriate are necessarily encompassed within the DOE's appeal of the IHO's determination.

marks omitted)).  Here, the SRO thoroughly analyzed the underlying record related to the substantive adequacy of the IEP and concluded that the April 2012 IEP's recommendation of an ICT program and related services was "reasonably calculated to enable [A.P.] to receive educational benefits for the 2012-2013 school year."  (SRO Decision at 15.)

Contrary to plaintiffs' contention, the SRO did not ignore A.P.'s social and emotional needs, specifically noting the parts of the IEP that are pertinent in that regard:

> With regard to the student's social/emotional management needs, the IEP indicated that the student had difficulty with social functioning. The student's present levels of performance further stated that he had difficulty managing his emotions in class, acted "silly," and became nervous during social situations.  The IEP noted that the student was better able to communicate with adults but was able to relate to students who were on his level socially.

(SRO Decision at 13 (citations omitted).)  The SRO also noted plaintiffs' concern "that the ICT class was insufficiently supportive and that the size and noise level of the class would cause the student to experience anxiety."  (Id. at 14.)  In addition, the SRO acknowledged the IHO's finding that "the student was not regulated enough, became overwhelmed in large situations, was unable to focus if there was a lot of noise, and was less able to attend to directions in a large class."  (Id.)  The SRO considered these concerns and ultimately determined that the IEP and the recommended placement were appropriate.  In particular, the SRO determined that A.P. "had shown improvement in social functioning and had a preferred group of friends in his then current environment."  (Id.)  The SRO concluded that "given the

student's improvements in social skills and his abilities relative to the regular education curriculum," "the district's recommended placement, consisting of an ICT classroom along with the related services of speech, OT and counseling represented the [least restrictive environment] for the student." (Id.)  The SRO specifically noted that, in addition to the ICT classroom, the proposed placement provided for three 40-minute counseling sessions to address A.P.'s social and emotional needs, including his self-advocacy and coping skills.  (Id. at 14-15.)  The Court will not disturb the SRO's well-reasoned and thorough determination as to the IEP's substantive adequacy.

## V.    CONCLUSION

For the reasons set forth above, plaintiffs' motion for summary judgment is DENIED and the DOE's cross-motion for summary judgment is GRANTED.

The Clerk of Court is directed to terminate the motions at ECF Nos. 9 and 14 and to terminate this action.

SO ORDERED.

Dated:      New York, New York
            July 30, 2015

                                        _____
                                        KATHERINE B. FORREST
                                        United States District Judge